UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                          Chapter 7

Johnny Terrell, Jr.,                            Case No. 09-63848

       Debtor.                              Hon. Phillip J. Shefferly
_____/

**OPINION (1) REGARDING COMPLIANCE WITH DISGORGEMENT
ORDER AND CONTEMPT ORDER; (2) FIXING INSTALLMENT PAYMENT
OBLIGATION; (3) IMPOSING FURTHER REMEDIES FOR NONCOMPLIANCE;
AND (4) MAKING CRIMINAL REFERRAL TO THE UNITED STATES ATTORNEY**

**Introduction**

On August 9, 2010, the Court entered an order regarding Derrick Hills, who is listed as the

bankruptcy petition preparer in this Chapter 7 bankruptcy case. The order recounted a long history

regarding Hills' involvement in this case. Among other things, the order continued a contempt

finding previously made against Hills by this Court, set forth a procedure for Hills to purge the

finding of contempt, and scheduled an evidentiary hearing for September 8, 2010, requiring Hills

to show cause why this Court should not impose additional remedies in the event that Hills failed

to timely purge the finding of contempt against him. The Court held the evidentiary hearing on

September 8, 2010. This opinion sets forth the Court's rulings based upon the record made on

September 8, 2010.

**Jurisdiction**

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), over which the Court has

jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). See In re Desilets, 268 B.R. 516, 517

(Bankr. W.D. Mich. 2001) ("Civil contempt proceedings arising out of core matters are themselves core matters.") (internal quotation marks and citations omitted).

## Procedural History

On July 31, 2009, the Debtor filed this Chapter 7 case. On September 11, 2009, the United States Trustee ("UST") filed a motion (docket entry no. 19) ("Disgorgement Motion") seeking an order requiring Hills, as the Debtor's bankruptcy petition preparer in this case, to return payment to the Debtor. The Disgorgement Motion alleged that at the time that this case was filed, and at all times relevant to this bankruptcy case, Hills was permanently enjoined from providing assistance as a bankruptcy petition preparer pursuant to an Order Granting Motion to Clarify Interim Order ("Permanent Injunction") entered by the Honorable Steven W. Rhodes in adversary proceeding no. 07-4210 on May 6, 2008. The Disgorgement Motion further alleged that the services rendered by Hills in assisting the Debtor with his bankruptcy petition in this case violated the Permanent Injunction, and the UST requested various relief against Hills pursuant to § 110(i) of the Bankruptcy Code. Hills did not respond to the Disgorgement Motion. On September 30, 2009, the UST filed a certificate of no response to the Disgorgement Motion, and on the same day the Court entered an order (docket entry no. 23) ("Disgorgement Order") granting the Disgorgement Motion and directing Hills to pay the Debtor $2,000.00 within seven days from the date of the Disgorgement Order.

On November 18, 2009, the UST filed a Motion for Contempt and for Other Relief (docket entry no. 25) ("Contempt Motion"). The Contempt Motion alleged that Hills failed to pay the $2,000.00 to the Debtor as required by the Disgorgement Order. The Contempt Motion requested that the Court find Hills in contempt of the Disgorgement Order. Again, there was no response from Hills. On December 8, 2009, the UST filed a certificate of no response to the Contempt Motion.

On December 11, 2009, the Court entered an order (docket entry no. 29) ("Contempt Order") finding Hills in contempt of the Disgorgement Order, requiring the payment of an additional $1,850.00, and scheduling a further hearing for January 4, 2010.

The UST and Hills appeared at the hearing on January 4, 2010. Hills appeared pro se, and asserted that he did not have the ability to pay the sums required by the Disgorgement Order and the Contempt Order due to a lack of income. Hills requested that the Court impose a payment plan once he obtains employment. The UST disputed the statements by Hills regarding his lack of income based upon statements that Hills had made in other bankruptcy cases pending in the Eastern District of Michigan in which Hills also served as a bankruptcy petition preparer. Nonetheless, the UST conceded that a payment plan to comply with the Disgorgement Order and the Contempt Order might be acceptable, provided that the UST and the Court have some factual record to support Hills' claim that he has no income. The UST requested that he be permitted to take a Fed. R. Bankr. P. 2004 examination of Hills ("Rule 2004 Examination") to verify Hills' claim that he has no income. Hills did not oppose that request. The Court granted the UST's request, and directed Hills to appear for the Rule 2004 Examination at a time agreed upon on the record by the UST and Hills, and to provide documents requested by the UST in connection with the examination. The Court then continued the hearing until February 8, 2010.

On February 5, 2010, the UST filed a motion in limine (docket entry no. 33) to exclude testimony by Hills at the February 8, 2010 hearing on those subjects about which he refused to testify at the Rule 2004 Examination. The motion attached a transcript from the Rule 2004 Examination in which Hills repeatedly invoked a Fifth Amendment privilege against

-3-

self-incrimination.  The Court scheduled the motion for the same time as the continued hearing on February 8, 2010.

At the hearing on February 8, 2010, Hills again appeared pro se.  He reiterated his statement that he did not have any income with which to comply with the Disgorgement Order and the Contempt Order, and also asserted that no purpose would be served by having the Court conduct an evidentiary hearing to attempt to set a payment plan because he would again invoke a Fifth Amendment privilege against self-incrimination.  Hills did not identify any pending or threatened criminal proceeding to support his invocation of a Fifth Amendment privilege against self-incrimination, but stated only that he had invoked it due to his fear of civil liability.  The Court informed Hills that it would not establish a payment plan absent information about Hills' income and ability to make payments.  Nonetheless, Hills continued to refuse to produce any information to enable the UST or the Court to ascertain Hills' income or financial condition.

The Court granted the UST's motion in limine, and entered an order (docket entry no. 36) that precluded Hills from testifying on any subject about which he refused to testify at the Rule 2004 Examination.  However, the Court did not impose any of the additional remedies sought by the UST at that time against Hills.  Instead, because the Court was advised that there were many other cases pending in the Bankruptcy Court for the Eastern District of Michigan in which Hills served as a bankruptcy petition preparer, and in which the UST sought various forms of relief against Hills, the Court requested that the UST file a list of those cases with the Court.  On February 10, 2010, the UST filed a declaration (docket entry no. 37) that listed 32 separate bankruptcy cases in which Hills was ordered by the Bankruptcy Court to pay specific sums to the debtors in those cases because of violations by Hills of the Permanent Injunction and § 110 of the Bankruptcy Code.

-4-

In reviewing the cases listed in the UST's declaration, the Court learned that not only was the Permanent Injunction entered against Hills, but also that a separate injunction ("Crane and Shore Injunction") was entered against Crane and Shore, Inc. by the Honorable Walter Shapero on January 20, 2010, in case no. 09-68447. Judge Shapero specifically found that Crane and Shore, Inc. was an alter ego of Hills, and expressly enjoined Crane and Shore, Inc. from providing any bankruptcy related services to any individual or entity in any bankruptcy case in this Court. In addition to the two injunctions entered against Hills and Crane and Shore, Inc., the Court's review of the cases listed by the UST revealed that Judge Rhodes had made a finding of contempt by Hills in adversary proceeding no. 07-4210 because of numerous violations of the Permanent Injunction. On October 8, 2008, Judge Rhodes issued an opinion in that adversary proceeding with detailed findings of violations by Hills of the Permanent Injunction, § 110 of the Bankruptcy Code, and § 528 of the Bankruptcy Code. Further, because Judge Shapero held that Crane and Shore, Inc. is the alter ego of Hills, the Crane and Shore Injunction in case no. 09-68447 also found that Crane and Shore, Inc. was in contempt of the Permanent Injunction.

After considering the record made at the February 8, 2010 hearing, the post-hearing declaration of the UST listing the various proceedings involving Hills and Crane and Shore, Inc., Hills' failure to pay the amount required by the Disgorgement Order and Contempt Order, and Hills' failure to purge the finding of contempt contained in the Contempt Order, the Court entered an order in this case scheduling an evidentiary hearing for September 8, 2010. The order explained that the Court had decided to provide Hills with yet another opportunity to purge the finding of contempt by paying the amount set forth in the Disgorgement Order and the Contempt Order. The order also explained that if Hills failed to timely purge the finding of contempt, Hills was required to appear

on September 8, 2010 to show cause why the Court should not impose additional remedies against him. The order further explained that both Hills and the UST would be permitted to submit evidence at the September 8, 2010 hearing and set forth a specific procedure for the introduction of any documentary evidence. Hills appeared and testified. The UST also appeared and called seven witnesses to testify. Hills requested that he be given one additional week in which to submit certain documents to the Court and to the UST for review. At the conclusion of the hearing, the Court took the matter under advisement.

### Applicable Law

#### A. Legal Standard for Contempt

Before turning to the evidence adduced at the hearing, a framework of the elements, defenses and remedies for civil contempt is helpful. It is axiomatic that "all orders and judgments of courts must be complied with promptly." Gnesys, Inc. v. Greene, 437 F.3d 482, 493 (6th Cir. 2005) (citation and quotation marks omitted). See also Maness v. Meyers, 419 U.S. 449, 459 (1975) ("The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.'") (quoting United States v. United Mine Workers, 330 U.S. 258, 293 (1947)). Unfortunately, at times those orders, like those at issue here, are not promptly complied with. "When a court seeks to enforce its order or supervise its judgment, one weapon in its arsenal is contempt of court." Electrical Workers Pension Trust Fund of Local Union #58, IBEW v. Gary's Elec. Service Co., 340 F.3d 373, 378 (6th Cir. 2003) (citation omitted).[1] The

---

[1] Although Hills has not contested this Court's power to hold him in contempt, it is now generally recognized and accepted that bankruptcy courts have both the inherent and statutory power of contempt. See, e.g., Solow v. Kalikow (In re Kalikow), 602 F.3d 82, 96 (2nd Cir.

overall "purpose of civil contempt is to coerce an individual to perform an act" required by a court order.  United States v. Bayshore Assoc., Inc., 934 F.2d 1391, 1400 (6th Cir. 1991) (citing in part United States v. Mine Workers, 330 U.S. at 303-04) (other citations omitted).  While the power to punish a party for civil contempt should not be invoked lightly, it is well-established that this power "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it [the courts] are mere boards of arbitration, whose judgments and decrees would be only advisory."  Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450 (1911).  A finding of civil contempt is "considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard.  Neither a jury trial nor proof beyond a reasonable doubt is required."  International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 827 (1994) (footnote omitted).

Before a court may hold a person in civil contempt, "the movant must produce clear and convincing evidence that shows that [the person] violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."  Gary's Elec. Service Co., 340 F.3d at 379  (citation and quotation marks omitted).

---

2010) ("The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders.") (citing Int'l Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 831(1994)); Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 423 (6th Cir. 2000) ("Section 105 undoubtedly vests bankruptcy courts with statutory contempt powers[.]"); Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d 472, 477 (6th Cir. 1996) ("Bankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct.") (citation omitted); Jove Engineering, Inc. v. I.R.S., 92 F.3d 1539, 1553 (11th Cir. 1996) (holding "that [11 U.S.C.] § 105 creates a statutory contempt power in bankruptcy proceedings, distinct from the court's inherent contempt powers").  The Court proceeds here under its inherent, rather than statutory, contempt power.  In re Downs, 103 F.3d 472 at 477.

-7-

The movant "must establish three elements by clear and convincing evidence: (1) the alleged contemnor had knowledge of the order which he is said to have violated; (2) the alleged contemnor did in fact violate the order; and (3) the order violated must have been specific and definite." Hunter v. Magack (In re Magack), 247 B.R. 406, 410 (Bankr. N.D. Ohio 1999) (citing Glover v. Johnson, 138 F.3d 229, 244 (6th Cir. 1998)) (other citation omitted). It must be emphasized that "[w]illfulness is not an element of civil contempt and intent to disobey the order is irrelevant." In re Walker, 257 B.R. 493, 497 (Bankr. N.D. Ohio 2001) (citing Rolex Watch, U.S.A., Inc. v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996)).

### B. Inability to Comply Defense to Contempt

"Once the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is presently unable to comply with the court's order." Gary's Elec. Service Co., 340 F.3d at 379 (citing United States v. Rylander, 460 U.S. 752, 757 (1983)). To meet this burden a contemnor is required to (1) "show categorically and in detail why he or she is unable to comply with the court's order[,]" (2) demonstrate that they "took all reasonable steps within [their] power to comply with the court's order[,]" and (3) "show that he is not responsible for the present inability to pay." Id. at 379, 383 (citations and internal quotation marks omitted). "The crux of the impossibility defense is, of course, *a lack of power* to carry out the orders of a court" and this "[l]ack of power in the contempt context means *a literal inability* to take the steps necessary to comply" versus "simply *an unwillingness* to take action . . . ." Palmigiano v. DiPrete, 710 F. Supp. 875, 882 (D.R.I. 1989) (emphasis added).

-8-

C. <u>Permissible sanctions for contempt</u>

"A decision on a contempt [motion] is within the sound discretion of the trial court . . . ." <u>Gary's Elec. Service Co.</u>, 340 F.3d at 378. Courts generally use two different methods to coerce a contemnor into compliance. The first is a monetary fine that either compensates the complainant for demonstrated damages resulting from the contempt, or a fine payable into the court that can be avoided by "performing the act required by the court's order." <u>Bayshore Assoc., Inc.</u>, 934 F.2d at 1400 (citations and quotation marks omitted). Section 110(i)(1) of the Code provides the statutory basis for the additional fines assessed against Hills in the Disgorgement and Contempt Orders. <u>See</u>, <u>e.g.</u>, § 110(i)(1)(B) and (C) (directing that "the court shall order" a bankruptcy petition preparer who violates § 110 or commits a "fraudulent, unfair, or deceptive" act to pay "the greater of — (i) $2,000; or (ii) twice the amount paid by the debtor" to the bankruptcy petition preparer along with reasonable fees and costs for bringing the motion).

The second permitted sanction for civil contempt is incarceration. "Incarceration has long been established as an appropriate sanction for civil contempt." <u>Bayshore Assoc., Inc.</u>, 934 F.2d at 1400 (citing United States Supreme Court cases dating back to 1911). The Sixth Circuit observed that "'[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command[.]'" <u>United States v. Conces</u>, 507 F.3d 1028, 1044 (6th Cir. 2007) (quoting <u>Bagwell</u>, 512 U.S. at 828) (brackets in original). "As used in the civil context, however, incarceration must be conditional. That is, once the defendant performs the act required by the court, he must be released." <u>Bayshore Assoc., Inc.</u>, 934 F.2d at 1400. Incarcerating a contemnor is coercive in nature, and not penal, because "the contemnor 'carries the keys of their own prison in their own pockets.'" <u>In re Burkman Supply, Inc.</u>, 217 B.R. 223, 226

(W.D. Mich. 1998) (quoting <u>Shillitani v. United States</u>, 384 U.S. 364, 368 (1966)).  However, the

Sixth Circuit has cautioned "that incarceration is a severe sanction" for contempt and "this measure

ordinarily should be employed only as a last resort."  <u>Conces</u>, 507 F.3d at 1043.

## The Evidentiary Hearing

In a reversal of his position taken at the February 8, 2010 hearing, Hills appeared on

September 8, 2010, and told the Court that he now wanted to testify regarding his income, assets,

and liabilities.  He also represented to the Court that he is willing to enter into an installment

agreement to pay the amount set forth in the Disgorgement Order and the Contempt Order.  He

further stated that he intends to pay the entire amount required by the Disgorgement Order and the

Contempt Order.  The UST observed that he did not bring evidence to the hearing regarding Hills'

present financial condition because the Court previously granted the UST's motion in limine based

on Hills' refusal to testify at the Rule 2004 Examination.  Despite this, the UST agreed that it made

sense to allow Hills to change his mind and for the Court to permit him to testify about his financial

condition.  The Court then proceeded to take evidence both from Hills and from the UST.

Hills testified that he presently has very limited sources of income.  Those sources consist

of food stamps, some miscellaneous odd jobs, collecting bottles, doing some work on movies being

filmed locally, and gambling winnings.  He also testified that he had friends who have helped him

out financially by providing him a loan, but he does not consider the loan to be income.  Hills

testified that he is seeking employment, specifically as a tractor-trailer driver.  He testified that his

expenses presently run about $1,750.00 per month, including $900.00 for rent, $250.00 for utilities,

$250.00 for food, $100.00 for transportation, $100.00 for payments ordered by Judge Shapero in

another bankruptcy case, and $150.00 to the 46th District Court for the State of Michigan on account

of a misdemeanor conviction. When asked if he had tax returns to evidence his gross income for the last few years, Hills explained that he did not have any tax returns with him, but requested that he be given an opportunity to produce them after the hearing. He estimated his 2008 gross income at somewhere between $45,000.00 to $50,000.00, and his 2009 gross income at somewhere between $2,000.00 to $3,000.00. Hills estimated his 2010 gross income to date as approximately $4,000.00 to $5,000.00 plus the $3,600.00 loaned to him by his friends. As for assets, Hills testified that he does not own a home, an automobile, or any other property except for an interest in two business entities: Crane and Shore Inc., and another corporation that he first referred to as SWRIP Inc., and which he later described as standing for "Shapero, Walter, Randel, Inbred and Paul Inc." Hills testified this second entity was formed to pursue various business ventures, in particular becoming a brand partner with a dietary supplement provider. According to Hills, neither of these entities transacted any business nor generated any income in 2010. As for liabilities, Hills testified that he owes approximately $80,000.00 in student loans, $60,000.00 to the Internal Revenue Service, $4,000.00 in parking tickets, and an unknown amount of medical bills. In sum, Hills testified that he presently does not have sufficient income or assets with which to pay the full amount owed by him under the Disgorgement Order and the Contempt Order.

The UST's cross-examination of Hills focused on Crane and Shore, Inc. Hills acknowledged that he was the owner of Crane and Shore, Inc. but stated that it has not generated any income since September 30, 2009 and it does not have any books or records. Hills testified that Crane and Shore, Inc. is no longer servicing any clients but instead is referring them out to other bankruptcy petition preparers. However, Hills admitted that he arranged for the production and airing of a television commercial for Crane and Shore, Inc. in January, 2010 (Exhibit 26). According to Hills, the purpose

-11-

of the commercial was to generate business referrals so that other bankruptcy petition preparers could receive income. But Hills insisted that Crane and Shore, Inc. did not have any fee-sharing arrangements with the various bankruptcy petition preparers who received referrals from Crane and Shore, Inc.

Subsequent to the hearing, with the Court's permission, Hills filed various documents in support of his testimony (docket entry no. 55). The first set of documents is an account history for an individual bank account in Hills' name, and a bank account in the name of Crane and Shore, Inc. The individual account only shows transactions between July 6, 2010 and September 7, 2010, with a balance on September 7, 2010 of $ 0.72. The account for Crane and Shore, Inc. only shows transactions from June 22, 2010 to August 31, 2010, with a balance on August 31, 2010 of ($408.53). He also filed copies of his individual federal income tax returns for the years 2007, showing a gross income $20,000.00, and 2008, showing a gross income of $3,729.00. Attached to the 2008 return was a Schedule C "Profit or Loss from Business" showing Hills as the proprietor but without a separate business name. That form shows gross income of $9,622.00 and total expenses of $9,420.00 for a net profit of $202.00. Hills also filed a letter, dated December 18, 2009, showing Michigan Food Assistance Program benefits that Hills was approved to receive for that month and into calendar year 2010. Finally, Hills filed a copy of a Notice to Appear in the 46th District Court for the State of Michigan on May 12, 2009, directing him to appear on June 1, 2009 for the purpose of paying a $1,150.00 judgment.

Although the UST did not come prepared to introduce any evidence of Hills' current assets or liabilities because of the order granting the UST's motion in limine, the UST did introduce substantial testimonial evidence of income that Hills has received since the Court first ordered Hills

-12-

to disgorge the sum of $2,000.00 in the Disgorgement Order entered on September 30, 2009. The UST called Paul Rawlins, Kathy Henry, Lakenya Snipes, Valerie McPhaul, Kimon Hutchinson, Carol Warfield, and Karen Riggs to testify. Rawlins testified that he owned a company that represents clients in Social Security disability cases along with providing divorce packages. Rawlins met Hills sometime in fall, 2008 and entered into an arrangement to refer clients in need of bankruptcy services to Hills for a fee of $75.00 each. According to Rawlins, after several referrals he offered to allow Hills to work out of Rawlins' office and charged Hills rent of $250.00 per month. Rawlins testified that he was initially unaware of any court injunction against Hills but later stopped the referral arrangement upon learning of a "charge" and "complaint" against Hills. Rawlins restarted the arrangement in January, 2010 after being assured that everything was being taken care of and that Hills would be conducting himself "within the guidelines." The financial arrangement was initially the same, but when business activity increased Rawlins raised the rent to $440.00 per month. Rawlins testified that he saw Hills meeting with clients in the office, that Hills was never in the office with clients by himself, and that he met numerous individuals who worked with Hills. Rawlins was also familiar with Crane and Shore, Inc., which he understood was a corporation set up to handle Hills' business and to protect Hills. Rawlins ended his arrangement with Hills on June 30, 2010, after receiving notice of a lawsuit against Hills.

Kathryn Henry, one of four bankruptcy petition preparers called by the UST, testified next. Henry is a former bankruptcy petition preparer who received client referrals from Crane and Shore, Inc. She testified she had a fee-sharing arrangement with Hills under which she received $150.00 of the $400.00 to $500.00 fee that each client was charged and that the rest of the fee went to Hills. Henry explained that she began working with Hills in January, 2010. She completed petitions for

seven to ten clients, but ended that arrangement in May, 2010 when she had to appear in court in connection with one of the petitions. Henry further testified that it was not until three or four months after she began to work with Hills that she became aware of any injunction prohibiting either Hills or Crane and Shore, Inc. from working as a bankruptcy petition preparer.

During Hills's cross-examination of Henry, when asked where the remainder of the fee went, Henry testified very directly that "I gave it to you [Hills] . . . on the days I prepared petitions for the clients you arranged for me to work with you on." Hills then questioned Henry regarding copies of contracts between individual debtors and various bankruptcy petition preparers (Exhibits A, B, C and D). All these contracts were signed between January 31, 2010, and May 22, 2010. Henry was described in the contracts either as an "associate" of Crane and Shore, Inc. or as an individual bankruptcy petition preparer. Of the nineteen contracts shown to Henry, all but four stated that the payment was made to Henry. The other four contracts show payment of $300.00 each by various debtors to "Shapero, Walter, Randel, Inbred & Paul" for referring those debtors to Henry for "bankruptcy petition preparation services." During the UST's questioning of Henry regarding these contracts, Henry testified she received the contracts from Hills as a part of a packet she used when preparing a debtor's petition. Despite her earlier testimony that she had a fee-sharing arrangement with Hills, and gave Hills all but $150.00 of the fee she charged to each debtor, Henry conceded on cross-examination that, except for the four contracts, the documents did not indicate on their face that anyone other than Henry received any of the fee recited in the contracts.

Lakenya Snipes testified that she began a business arrangement with Hills in September, 2009. While she thought initially that all she would do was simply refer clients to Hills, Snipes testified that she later "was told that [she] had to fill out the paperwork." She testified she had "help

-14-

from" Hills because she "had no idea about bankruptcy petition[s]" and never learned enough to prepare petitions by herself. Snipes testified that she prepared between seven and ten petitions, and, under her fee-sharing arrangement with Hills, she kept "half" of the $500.00 to $600.00 fee charged to each debtor. Snipes stopped preparing petitions in early 2010 upon receiving notice in the mail that "it was illegal or wasn't supposed to be done." On cross-examination, Hills introduced through Snipes eight contracts (Exhibit E), that Snipes testified she received from Hills. Each of these contracts state that the debtor paid for the services of Lakenya Snipes as a Crane and Shore, Inc. bankruptcy petition preparer. Like Henry, Snipes admitted on cross-examination that she alone prepared the debtors' documents and that the contracts stated that each debtor paid her the fee, although she too remained firm in her testimony that Hills received the balance of the fee, even if the contracts did not say so.

Valerie McPhaul testified that she first met Hills in 2007 as a client, began working for him in 2008 as a bankruptcy petition preparer, resumed working for him in 2010 as an "independent contractor . . . [p]reparing bankruptcy petitions," and continued to do so until April, 2010. Under her most recent business arrangement with Hills, she was "provided clients" who were charged a fee for petition preparing services and "when those services were completed, we left money in a top drawer." McPhaul, like the other petition preparers, testified that when the debtor paid her the fee, she kept $150.00 under her fee-sharing arrangement with Hills, and she left the remainder of the fee for Hills "in a designated spot." She further testified that most clients were referred to her but that she did generate a few clients on her own. McPhaul testified that Hills did not tell her that he was enjoined from acting as a bankruptcy petition preparer.

-15-

During Hills' cross-examination of her, McPhaul testified she filled out clients' paperwork "with assistance" from Hills and when "there was any confusion on interpretation of any of the questions," Hills "provided . . . clarity." McPhaul explained that this assistance enabled her to "properly interpret and complete the information in front of me." McPhaul testified that although the contracts with the debtors may indicate that she alone completed the bankruptcy petitions, Hills "answered questions and provided clarity." Hills then introduced through McPhaul several contracts between McPhaul and various debtors (Exhibits F, G and H). Similar to the contracts with the prior witnesses, these contracts indicated that each of the debtors paid McPhaul, although some of the contracts referred to her as "Crane and Shore, Inc. associate" McPhaul.

The last bankruptcy petition preparer called by the UST was Kimon Hutchinson. Like Henry, Snipes and McPhaul, Hutchinson also had a bankruptcy petition preparer business relationship with Hills. Her association with Hills began sometime in February, 2010. Hutchinson testified that she was asked to be in the Crane and Shore, Inc. television commercial and then began to work as a bankruptcy petition preparer under a fee-sharing arrangement with Hills, similar to the other witnesses, in which she received $150.00 of the $400.00 fee charged to each debtor. Hutchinson testified that eventually, she no longer needed Hills' assistance and then began receiving half of the fee charged to each debtor. Hutchinson stated she was not aware of any court orders precluding Hills from operating as a bankruptcy petition preparer until March, 2010. Hutchinson stated she stopped working for Hills sometime after learning of the court orders regarding Hills. On cross-examination by Hills, Hutchinson testified that Hills provided her most of the contracts she signed with the debtors except for those created by McPhaul, who is her cousin. Hills showed Hutchinson a representative sample of four different types of contracts stating that the debtors each

-16-

paid Hutchinson, apparently in an effort to contradict Hutchinson's testimony that Hills had received income since being enjoined from acting as a bankruptcy petition preparer (Exhibits I through L). However, much like the cross-examination of the other bankruptcy petition preparers, Hutchinson explained that although the contracts recite that she received the fee and do not mention Hills, the reason was "because you [Hills] refused to take any money physically."

The UST also called Carol Warfield, a Chapter 7 debtor and a former client of Hills. She testified she met with Hills on November 18, 2009, for the purpose of filing a bankruptcy case. Warfield testified that at the meeting, Hills instructed another person, Aprill Tubbs-Streeter, what information to put in the petition. Warfield testified she paid Hills $375.00 cash for his services. On cross-examination, Hills asked Warfield about testimony she had given in her own bankruptcy case before Judge Shapero at a hearing regarding Hills' services as a bankruptcy petition preparer in that case. Warfield admitted that she testified at that hearing that only Tubbs-Streeter had prepared her documents, but explained that the reason for that testimony was because Hills had intimidated and improperly influenced her. Warfield testified that Hills "came to my home that . . . afternoon before we went to court . . . [and] before you [Hills] left my home . . . you said, 'If they asked if I was there, you just tell them that I was just an observer.'" When Hills asked Warfield on cross-examination if she lied when testifying before Judge Shapero, and Warfield admitted that she did, she explained "that was because of you [Hills]. You had me a nervous wreck." Warfield further explained that "[t]he second time I was in front of Judge Shapero I told the truth because I couldn't live with myself knowing what I had done."

The final witness called by the UST was Karen Riggs, a paralegal with the UST. She testified regarding a summary list she created by compiling all the bankruptcy cases filed since the

-17-

entry of the Disgorgement Order that show Hills, Crane and Shore, Inc., or individuals who identified themselves as working for Crane and Shore, Inc., as the bankruptcy petition preparers. Riggs testified that she prepared the summary from the "Declaration for Debtors Without an Attorney" disclosure forms filed in each case, and from transcripts of § 341 meetings and other hearings. The Court admitted the summary into evidence under Fed. R. Evid. 1006. (Exhibit 25.) The summary identifies 206 cases that were filed after the Disgorgement Order showing either Hills or Crane and Shore, Inc. as the bankruptcy petition preparer, although Riggs cautioned that she was not sure that she found every case involving Hills or Crane and Shore, Inc.

## Analysis

### A.  The UST has met its burden to prove contempt

The threshold question in this contempt proceeding is whether the UST met its burden of showing by clear and convincing evidence that Hills had notice of the Disgorgement Order and Contempt Order and violated those Orders by failing to pay the amount directed.  Gary's Elec. Service Co., 340 F.3d at 379.  The Court initially made a finding of contempt in the Contempt Order. That finding was supported by the uncontested allegations in the Contempt Motion that Hills did not answer.  But even without those uncontested allegations, the record made in this case on September 8, 2010 unquestionably demonstrates that the UST has met its burden.  Hills repeatedly acknowledged in open court at prior hearings that he knew of the Orders and did not comply with them.  Hills did not disavow any of these statements on September 8, 2010.  Nor has Hills challenged the definiteness of either Order either at prior hearings or on September 8, 2010. Therefore, the Court holds that the UST has established a prima facie case of contempt.

-18-

### B. Hills has not met his burden to prove inability to comply

Because the UST presented a prima facie case of contempt, the burden in this proceeding shifts to Hills to show he is unable to comply with the Orders. Id. A review of the evidence from the September 8, 2010 hearing demonstrates that Hills has not met his burden.

When asked by the Court what evidence there was of his inability to pay the required amounts, Hills responded that there was "only my testimony." However, Hills also introduced into evidence 44 bankruptcy petition preparer contracts, apparently to attempt to show that he did not receive payments from any of the debtors who were referred to Henry, Snipes, McPhaul, and Hutchinson. In addition, after the hearing, Hills also filed with the Court bank statements, income tax returns, and other documents to support his testimony.

Addressing first the testimony at the hearing, Hills estimated he had $4,000.00 to $5,000.00 of income this calendar year along with approximately $3,600.00 in a loan from friends. Against this income Hills testified he has $1,750.00 in monthly expenses. Hills also testified he has received no money from Crane and Shore, Inc. and that Crane and Shore, Inc. received nothing for referring debtors to bankruptcy petition preparers such as Henry, Snipes, McPhaul, and Hutchinson. Hills' testimony, however, is directly contradicted by multiple witnesses called by the UST.

Henry, Snipes, McPhaul, and Hutchinson all testified consistently with one another that there was a stream of cash income that Hills somehow received, either directly or indirectly, through Crane and Shore, Inc., after he was ordered to disgorge in this case. Each of those witnesses credibly testified to participating in a fee-sharing arrangement with Hills and Crane and Shore, Inc. whereby they each kept a portion of each cash fee collected from a debtor, with the largest portion of the fee going to Hills. McPhaul described leaving the funds in a designated drawer in Crane and

-19-

Shore, Inc.'s office where she prepared the petitions. Henry testified that she gave the cash to Hills directly. And Hutchinson said she took the cash fee from debtors only because Hills refused to physically accept the cash. In addition, Warfield testified that she directly paid Hills $375.00 for his services on November 18, 2009. The collective testimony of these witnesses overwhelmingly demonstrates that Hills has received a steady stream of cash since the Disgorgement Order and Contempt Order were entered, even though he structured fee-sharing arrangements to create the appearance that he was not receiving any fees. The testimony also demonstrates that after Judge Rhodes entered the Permanent Injunction, Hills continued to provide bankruptcy petition preparer services through Crane and Shore, Inc. as a way to circumvent the Permanent Injunction. The testimony further demonstrates that once Judge Shapero entered the Crane and Shore Injunction, Hills continued to have bankruptcy petition preparer services performed by other individuals using the facade of Crane and Shore, Inc., with cash payments secretly still going back to Hills.

The evidence in the record does not reflect an inability to comply with the Disgorgement Order and Contempt Order. Instead, the clear picture that emerges from the testimony of the UST's witnesses is that Hills is simply unwilling to comply with those Orders and therefore, does his best to stay one step ahead of those and other Court orders. After Judge Rhodes entered the Permanent Injunction, Hills found a way to end run that injunction by having Crane and Shore, Inc. act as the petition preparer. And after Judge Shapero entered the Crane and Shore Injunction, Hills found a way to end run that injunction by having each debtor sign a contract stating that they were paying their fee to an individual bankruptcy petition preparer instead of Crane and Shore, Inc. But all of those individuals were performing those services either directly for Hills or for Crane and Shore, Inc., and all of them took direction from Hills and shared their fees with Hills. The evidence shows

-20-

that Hills also formed Shapero, Walter, Randel, Inbred, and Paul, Inc., apparently as a new entity to refer debtors to bankruptcy petition preparers according to some of the contracts he introduced into evidence. Hills further circumvented the Crane and Shore Injunction by having Crane and Shore, Inc. stop referring debtors to certain bankruptcy petition preparers once those individuals themselves were personally enjoined, only to continue referring debtors to still other individual bankruptcy petition preparers working with him until they too were personally enjoined. It is also worth noting that the contracts that Hills introduced into evidence not only tried to hide his involvement, but also tried to hide the amount of the fee charged after the Court entered Administrative Order No. 10-21 on April 4, 2010. That order sets a presumptive maximum fee a bankruptcy petition preparer in the Eastern District of Michigan at $100.00. Hills' exhibits include several two-part contracts dated after that order was entered in which the first contract was for $100.00 and the second contract was for a $300.00 fee for referring the debtor to the bankruptcy petition preparer. The only conclusion to be drawn is that this change was intended to create the illusion that Hills was complying with the Court's Administrative Order while still collecting the typical fee of $400.00 per individual debtor.

Hills' attempts to distance himself from Crane and Shore Inc. as a means of showing an inability to comply with the Disgorgement Order and Contempt Order were simply not credible to the Court. His testimony is particularly incredible in light of the January, 2010 television commercial introduced by the UST during cross-examination that shows Hills with a number of other individuals advertising the services of Crane and Shore, Inc. Hills' explanation that he arranged for the production and airing of this commercial simply to help Henry, Hutchinson, and other bankruptcy petition preparers obtain a source of income, with no monetary benefit to himself,

is not believable. And while Hills' name does not actually appear on bankruptcy petitions as a bankruptcy petition preparer after Judge Shapero entered the Crane and Shore Injunction on January 21, 2010, it is clear to the Court from the mountain of evidence in the record that it was business as usual with Hills continuing to receive a cash revenue stream in the form of fee-sharing agreements with numerous individuals acting as bankruptcy petition preparers for debtors with Hills' assistance and under his supervision via referrals from Crane and Shore, Inc.

The degree to which Hills continued business as ususal is evident from the exhibits he introduced and the summary prepared by Riggs. Even the most conservative analysis of Hills' own exhibits, coupled with the credible testimony of multiple witnesses, permits the reasonable inference that between January and May, 2010, Hills had direct or indirect access to a substantial sum of cash. Hills himself introduced 31 sample contracts into evidence. The dates of the samples ranged from January 31, 2010 to May 22, 2010. They do not represent all of the contracts made by debtors with Hills, Crane and Shore, Inc., and the witnesses during that time frame. Out of the 31 sample contracts, 30 indicated that the debtor paid $400.00 and one indicated that the debtor paid $500.00 for the preparation of a bankruptcy petition. Each of the bankruptcy petition preparer witnesses testified that they typically received $150.00 of the fee and left the remaining cash in the Crane and Shore, Inc. office. So of the total $12,500.00 (30 times $400.00, plus $500.00) reflected in the sample contracts as paid by those debtors, $4,650.00 of cash was kept by the bankruptcy petition preparers (31 times $150.00), and the remaining $7,850.00 of cash was left for Hills in the office of Crane and Shore, Inc. Without taking into consideration any of the other cases in which a fee was collected by Hills, Crane and Shore, Inc. or a bankruptcy petition preparer associated with either of them, and there appear to be many according to the UST's evidence, the only reasonable inference

is that Hills had direct or indirect access to more than enough cash to pay the $3,850.00 required by the Disgorgement Order and the Contempt Order, or at least make a good faith effort to repay some portion of that amount. There may be some irony in finding that Hills continued to generate income by violating the injunctions entered by Judge Rhodes and by Judge Shapero, and at the same time finding that he could have used that unlawfully gained income to purge the finding of contempt under the Contempt Order. However, the larger point is that the evidence establishes that Hills had access to cash, whether earned from violations of the injunctions, wages, gambling winnings, or loans from friends, sufficient to pay the $3,850 required under the Disgorgement Order and Contempt Order.

The documents Hills filed after the hearing do not change this conclusion. The Court finds that they are of little or no probative value. There is no evidence, for example, that the bank accounts for which Hills provided account histories are the only accounts that he or Crane and Shore, Inc. have maintained since the Disgorgement Order and Contempt Order were entered. The account histories also only cover a small window of time and do not provide a complete and detailed financial picture of even that small window. Moreover, the witnesses called by the UST testified repeatedly and consistently with each other that they received cash payments from debtors, took their agreed share, and left the remainder "in a top drawer" or other "designated spot" in Hills' office because Hills "refused to take any money physically." In light of this testimony describing a cash-only revenue stream, it is not surprising that Hills' individual bank account history would not reflect any funds presently on deposit. Nor do the bank statements show any transactions corresponding to Hills' claimed expenses, such as rent or utility payments. At best, Hills' documents arguably provide some support for his testimony that neither he nor Crane and Shore,

-23-

Inc. presently have the funds in these accounts to pay the total amount owed under the Disgorgement Order and Contempt Order in a lump sum. But these cryptic and incomplete documents ultimately fail to demonstrate a present inability to pay.

There is plenty of evidence in the record showing that Hills continued to receive substantial cash income after the Disgorgement Order and the Contempt Order were entered. There is little evidence of Hills' assets and liabilities during the time after the entry of the Orders and at the time of the evidentiary hearing, only Hills' own self-serving testimony which, if believed, does not show a present ability to pay the full amount required under the Disgorgement Order and the Contempt Order. Nonetheless, despite the paucity of credible evidence of Hills' current assets and liabilities, the Court finds that Hills did have sufficient income after the Disgorgement Order and the Contempt Order were entered to pay the amount required under those Orders if he had chosen to. Notwithstanding Hills' professed desire to comply with the Disgorgement Order and Contempt Order, the evidence convinces the Court that Hills was not unable to comply, but instead was simply unwilling to comply with the orders of this Court. After considering all of the evidence, the Court finds that Hills has not met his burden to prove that he is unable to comply with the Disgorgement Order and the Contempt Order.

C. The remedy for Hills' contempt and his failure to prove his inability to comply

The finding of contempt made in the Contempt Order continues. Hills has failed to purge it. Nothing has changed since the Contempt Order was entered. The only issue for the Court now to consider is whether Hills has shown cause as to why the Court should not incarcerate him or impose some additional remedies for his failure to purge the contempt finding.

-24-

The UST urges the Court to incarcerate Hills until such time as he complies with the Disgorgement Order and the Contempt Order by paying the amount required by those orders. The UST asserts, with good reason, that Hills does not take this Court's orders seriously, and that he will only comply with these orders if faced with incarceration. Indeed, the UST points to the fact that the only known time Hills has paid any of the sums ordered to be paid by him in any of the bankruptcy cases in which he has been found to have violated § 110 of the Bankruptcy Code is the one instance where he made payment on May 14, 2010, of $200.00 in case no. 09-71260 only after it became clear to him at a hearing before Judge Shapero that he was going to be incarcerated for his failure to purge a finding of civil contempt unless he made the payment immediately. The UST's argument is persuasive that Hills will only pay the ordered amount when faced with immediate incarceration.

There is ample authority to support this Court ordering the incarceration of Hills until he pays the amount required by the Disgorgement Order and the Contempt Order. Hills seeks to avoid incarceration by now stating that he intends to pay the amount owed under the Disgorgement Order and the Contempt Order, and requests that he be granted the opportunity to pay it in installments in the range of $75.00 to $100.00 per month, which Hills believes he can accomplish.

The Court overall is very skeptical regarding much of Hills' testimony. Yet, despite the Court's skepticism, the Court will not ignore Hills' offer to pay the amount required under the Disgorgement Order and the Contempt Order, and thus purge the contempt. Bearing in mind that "incarceration is a severe sanction" for contempt and "this measure ordinarily should be employed only as a last resort," Conces, 507 F.3d at 1043, the Court has determined not to incarcerate Hills at this time. Instead, the Court will grant Hills the payment program that he has requested. The

-25-

Court's reasons are as follows: First, Hills states unconditionally that he intends to pay the amount required under the Disgorgement Order and the Contempt Order. Second, there is no evidence that he presently has the ability to pay the amount required in a lump sum. Third, there is no evidence that Hills has any assets that could presently be liquidated today to satisfy this amount. Fourth, the purpose of these contempt proceedings is not punitive, but instead is to coerce Hills to pay the ordered amount. That is still the goal. Therefore, the Court adopts the payment plan offered by Hills in the amount of $100.00 per month, with the first payment due and payable on November 1, 2010, with successive payments due on the first day of each month thereafter until the required amount is fully paid. However, to be clear, this is Hills' last chance. The Court has already provided Hills with more opportunities to pay the ordered amount than his conduct has warranted. As a result, if Hills fails to make any monthly payment on a timely basis, upon the UST filing an affidavit evidencing such non-payment, the Court will immediately issue a warrant for Hills' arrest without any further proceedings and Hills will be incarcerated until the missed installment payment is made.

## Conclusion

Although the Court has determined to allow Hills to pay the ordered amount by installments, the evidence in this case is overwhelming that Hills and Crane and Shore, Inc. continuously and repeatedly violated the two injunctions entered against them by Judges Rhodes and Shapero. Further, Hills' testimony regarding the business entity of Shapero, Walter, Randel, Inbred and Paul Inc., or as Hills' referred to it, "SWRIP," although somewhat incredible, is deeply disturbing and arguably threatening to the Court. Hills testified that this is a business entity that he formed and owns for the purpose of partnering to supply dietary supplements. Yet this claimed purpose is not

-26-

believable, and was flatly contradicted by the contracts Hills himself introduced showing that Shapero, Walter, Randel, Inbred and Paul Inc. has been collecting cash for referring debtors to bankruptcy petition preparers. Furthermore, when asked directly by the Court why he named it "Shapero, Walter, Randel, Inbred and Paul Inc.," Hills answered: "I really don't have an explanation. It was just something I thought of." It is preposterous to this Court that Hills could not think of a reason why he named this business entity that he formed and owns after Judge Walter Shapero and the attorney representing the UST in this and other cases against Hills, Paul Randel.

Even more troubling was Warfield's testimony. On cross-examination by Hills, Warfield testified that she appeared at two prior hearings before Judge Shapero in her own bankruptcy case and that, at the first of those hearings, she gave testimony contrary to her testimony before this Court. Warfield acknowledged that she had earlier lied in that hearing while under oath but then explained credibly that she did so only because Hills came to her house "the afternoon before we went to court" and told her that if asked about his presence during her petition preparation to "just tell them that I [Hills] was an observer." Warfield further testified in this Court that Hills' presence at her home caused her to lie because he "had made me a nervous wreck." Warfield's testimony that Hills appeared at her home and intimidated her to such a degree that she perjured herself is uncontroverted.

Quite apart from the consideration of how to get Hills to comply with the Disgorgement Order and the Contempt Order, because of the overwhelming evidence in the record regarding Hills' violation of the injunctions, formation of Shapero, Walter, Randel, Inbred and Paul Inc., and witness intimidation, and because of Hills' own incredible testimony, the Court finds that it has reasonable grounds to believe that Hills may have committed violations of one or more federal criminal laws

and that an investigation should be made. In these circumstances, the Court has the responsibility and obligation to report to the United States Attorney all of the facts and circumstances of this case so that a complete an investigation may be conducted and, if appropriate, criminal proceedings commenced. Therefore, pursuant to 18 U.S.C. § 3057, the Court will refer this matter to the United States Attorney for further investigation.

The Court will enter a separate order, consistent with this opinion, that sets forth the terms of the installment payments for Hills, and that also refers this case to the United States Attorney for further investigation.

Signed on October 13, 2010

                                          **/s/ Phillip J. Shefferly**
                                          **Phillip J. Shefferly**
                                          **United States Bankruptcy Judge**